IDA COUNTY SAVINGS BANK, Plaintiff and Appellant, v. WILL E. JOHNSON, Defendant and Appellee.

**Real property:** QUIETING TITLE: EVIDENCE. In this action for possession and to quiet title the evidence is reviewed and it is *held,* that there was an agreed price for the land and that defendant went into possession in anticipation of the mutual performance of the agreement.

**Same:** CONTRACT OF PURCHASE: PART PERFORMANCE. A vendee of real property may offset any claim due him from the vendor against the purchase price, but in the absence of any agreement the mere existence of such indebtedness will not operate as part performance of the contract.

**Same:** PLEADINGS: EQUITABLE RELIEF. Where the plaintiff asks simply for the possession of land, rents and profits and that his title be quieted, and the defendant pleads simply the conclusion that he bought the land and entered into possession, neither of the parties making any reference to the nature of the contract, whether executed or executory, or whether performed in whole or in part, the pleadings will not authorize equitable relief based on the contract, although existence of the same may appear from the evidence.

**Account stated:** EVIDENCE. The statement of an account for services rendered, which is accepted by the other party, constitutes an account stated, and no further proof of the items therein is necessary. The evidence in this case is held insufficient to establish the bill for professional services as an account stated.

**Real property:** CONTRACT OF PURCHASE: PLEADINGS: EVIDENCE. Although the failure of plaintiff, in an action for possession of land and to quiet title, to ask alternative relief by way of recovery of the purchase price may excuse defendant from pleading a counterclaim, still where the legal title is in plaintiff defendant is bound to justify his possession; and if he bases this right upon a contract of purchase he must plead and prove the contract and performance or tender of performance on his part.

**Banks and banking:** POWER OF OFFICERS. Although the directors of a bank, under the authority of its articles of incorporation, employed the vice-president to supervise and conduct its business, still the president had the authority to dispose of land acquired by the bank; and his act in so doing in this instance was valid, especially as the managing officer knew of and acquiesced therein.

**Same:** UNAUTHORIZED ACTS: BURDEN OF PROOF. A bank has the burden of proof in seeking to show that the acts of its officers were unauthorized.

**Same:** EVIDENCE. Authority of a bank official to act for it, or the ratification of his unauthorized act, need not be a matter of record on the books of the bank; it is a question of fact which may be otherwise shown.

**Real property:** CONTRACT PRICE: EVIDENCE. The evidence in this action is held to support the defendant's contention as to the contract price of the land in question.

**Same:** APPEAL: DETERMINATION OF ISSUES: REMAND. In this action plaintiff sought possession, rents and profits, and asked that his title be quieted to the land in controversy. Defendant pleaded purchase and possession and asked that his title be quieted. The evidence established defendant's contract of purchase and his possession, but failed to disclose payment. There was evidence that defendant had performed services for plaintiff which might have been applied on the purchase price, but there was no showing of the amount of the services. Plaintiff's right of action for the price and defendant's action for the services are now barred. *Held,* that a reversal of the judgment for defendant would be inequitable; that defendant was entitled to an enforcement of the contract and to have his title quieted, but that he should pay the full

purchase price, subject to any offset for services, and the cause is remanded with leave to both parties to amend their pleadings to this end.

*Appeal from Ida District Court.*—HON. F. M. POWERS, JUDGE.

FRIDAY, MAY 17, 1912.

ACTION to quiet title and to recover possession of a fractional forty acres of land. The defendant answered that he was in possession of the land in pursuance of purchase thereof from the plaintiff through its officers. By cross-bill he prayed that his title thereto be quieted. There was a decree for the defendant on his cross-bill, and the plaintiff appeals.—*Modified and Remanded.*

*Charles S. Macomber,* for appellant.

*M. M. White* and *Johnston Bros.,* for appellee.

EVANS, J.—The plaintiff is a savings bank located in Ida Grove, Iowa. The alleged oral purchase of the land by defendant occurred in 1901. The plaintiff had re-

1. REAL PROP-ERTY: quieting title: evidence.

cently acquired the land by foreclosure of a mortgage thereon. Prior to June 4, 1901, Hadlock was president and Dessel was vice president of the bank. On the date named, Dessel became president and Hadlock retired and soon thereafter removed from the state. The land was acquired by the bank in 1900. At about the same time, a contract of sale thereof was made to one Buss. By reason of some objection to the title, such sale was not consummated, and Buss became a renter of the property from the plaintiff for the year beginning March 1, 1901. The defendant was a practicing attorney, and was attorney for the bank in various suits pending at and before such time. He was also a stock-

holder.   It is the claim of the defendant that, shortly after the failure of the Buss contract, the managing officer or officers of the bank solicited him to purchase the same, and that he agreed with them upon a price, and that he took possession in pursuance thereof by renting the land to Buss in his own name for the ensuing year beginning March 1, 1902, and that he has continued in such possession ever since, with the knowledge and acquiescence of the bank officers.   On the other hand, the appellant contends that there never was a completed agreement between the appellant's officers and the defendant, and that in any event such officers of appellant were without authority to make the alleged agreement.   We have therefore first to dispose of a question of fact relating to the alleged negotiations of 1901.

The defendant in his behalf called as a witness H. A. Dessel, the president of the plaintiff bank, and personally examined him as follows:

Q. Up to the time you left the bank you had made no efforts to rent this land for the year 1902?   A. Not that I remember of.   Q. Why?   A. At that time, if I remember right, you had some talk with Mr. Hadlock relative to this piece of land.   Q. Was it your understanding that I bought the land?   A. My understanding was that you had concluded or agreed upon a price.   Q. What was the price?   A. To the best of my recollection was $1,300 or $1,350.   Q. And you knew, or at least you understood, that I had some talk with Mr. Hadlock and had agreed on a price with the savings bank for this land?   A. Certainly.   Q. And you knew, after you talked with Mr. Hadlock or myself, or whoever it might have been, that the bank had lost title to that land, at least to such an extent that you did not think it was necessary, as the active manager in charge of the bank's interest, to give it any further thought, care, or attention, and you made no attempt to lease it for the year 1902?   A. As I told you before that I understood, as near as I remember it, that Mr. Hadlock told me he had some kind of a deal with you, and as I told you, to the best of my

recollection, it was $1,300 or $1,350, or in that neighborhood anyway, and I spoke to you, wanted to get it fixed up. You said you had a claim against the Ida County Savings Bank. They were owing you. Q. In all the talks, the talk was not that I did not own the land, was it? A. The talk was, I talked from the standpoint of what Mr. Hadlock had told me, and you claimed that you had a bill against the bank. Q. In all the talks we might have had you never claimed that I didn't own this land? A. You certainly didn't own it because you didn't pay for it. Q. I had bought it, bargained for it? A. I say all I knew about it was that Mr. Hadlock told me that you had made a bargain for it. Q. There never was any dispute between you and I, at any time, was there, that I didn't own the land? A. I don't think we ever argued that question. Q. The whole talk was how it was to be paid for, that was the question, wasn't it? A. The question was to make a settlement of some kind. Q. A settlement of what? A settlement of what I paid for the land, wasn't it? A. The dispute was just the same as the one that was brought up in the minutes of the board of directors to get a settlement—to get it out of the world. That was the dispute. Q. Mr. Hadlock told you that I had bargained for the land? A. As far as I can remember it; yes. Q. Hadlock told you that I had bargained for that land, and the price that I was to pay for it. Is that right? A. My recollection is that he had a deal with you and bargained for the piece of land that was unsettled, but the price was made. The land that I talked with Mr. Hadlock about was the land in controversy.

The defendant himself testified as follows:

Some time in the year 1901, and before September 13, 1901, that date I wrote to Mr. Buss regarding the renting of the land. At that time I owned the land because I was negotiating with Mr. Buss to rent it. The bank had the land and it was bringing but little rent. Mr. Dessel suggested to me that if I would buy it myself they would make a discount on what they offered it to Buss for. Then I went up there, I had talks with Mr. Dessel and Mr. Hadlock as to which one the deal was closed with, whether one or both. I can't remem-

ber positively, but the upshot of it was that they discounted the price to me $100, as I understand it. I was to take the land for $1,200. It was incumbered by judgments complicated that particular time I think by a suit, Chase v. Conry. That at the time I purchased this land from the bank they turned over to me the abstract of title together with the opinion of the loan company. I leased the land in the fall or early fall of 1901 to Mr. Buss. Mr. Buss went into possession under my lease in the spring of 1902, and he has continued under my lease under his tenancy with me from the spring of 1902 to the present time, paying me the rent.

The foregoing is the only testimony in the record relating to the negotiations. It is not very definite in its details. The details of the negotiations, however, are not of themselves of controlling importance if it is otherwise made to appear that an agreement for the purchase at a fixed price was in fact reached and that the defendant went into possession thereunder. No deed or writing of any kind was ever executed. The circumstance which bears most strongly against the defendant is that he has never paid for the land. Neither has he ever tendered payment in any formal way. It also appears that, at the time of such negotiations and afterwards, something was due the defendant from the plaintiff for attorney's fees in impending suits. On July 24, 1902, the plaintiff paid to the defendant a bill of $521.65 for services to date in the district court in the "*Knepper* case." At a later time the plaintiff paid him $1,000 in the "*Sidensticker* case." In the collection of these amounts by defendant from the plaintiff bank, no account was taken of the $1,200, alleged purchase price of the land. As against this, however, it is claimed by the defendant that the plaintiff bank was owing him at the same time about $525 for services rendered in other cases, principally the "*Willett* and *Heinrich* cases." He also claims that he was then expecting to perform other services, and especially in the *Knepper* case which had

been appealed to the Supreme Court, and he contends in his evidence that such services rendered, and thereafter rendered, were more than sufficient in amount to pay the full purchase price of the land.

Upon the whole record we think it must be said that the president of the bank and the defendant did agree upon a price for the land, and that possession was taken in anticipation of mutual performance of such agreement. The testimony of Mr. Dessel, president of the bank, will permit of no other conclusion at this point. It is earnestly argued by counsel for appellant that Mr. Dessel was mistaken in his testimony. His candor as a witness is conceded. The fact remains that for many years he has acquiesced in the possession of the land by the defendant upon the theory that he was to have a conveyance thereof upon payment of an agreed price. The defendant has collected all rent and paid all taxes without protest, until the bringing of this suit; the rent, however, being greater for each year than the tax. This long acquiescence on the part of the managing officers, with knowledge of the claim of defendant, is in itself in the nature of an admission by the corporation of the existence of such agreement. The weight of such acquiescence as an admission may be greater or less according to the circumstances.

Up to this point we are assuming authority in the president to make the agreement contended for. It is strongly urged by appellant that there was no such authority in the president. We will give that question further consideration later. The agreement, such as it was, was executory and was wholly unperformed on defendant's part. The agreement manifestly contemplated simultaneous performance by both parties. The defendant bargained for no credit nor for deferred time of payment. It was no part of the agreement that defendant's attorney's fees should apply upon the purchase price. This would not prevent the defendant

2. SAME: contract of purchase: part performance.

from offsetting any claim in his favor against the purchase price in a proper way. But the mere existence of such a claim, if any, did not operate as a part performance of the contract on defendant's part.

Were it not for the state of the pleadings, the equities of the case appear to us simple enough. Having found the existence of the agreement and possession thereunder, elementary equity would seem to require that the title should be awarded to the defendant on condition that he perform on his own part and pay the purchase price, with interest thereon from the date of the defendant's taking possession of the land. Equity would also require that the defendant be permitted to offset against the purchase price any valid claim held by him against the bank at the time of the commencement of this suit in 1908. But the plaintiff's petition asked only for possession of the land and for rents and profits and to quiet its title. It ignored the alleged agreement and asked no alternative relief in relation thereto. The defendant filed a cross-bill with his answer. He did not plead the terms of the agreement. He only pleaded as a conclusion that he had "bought" the land from the plaintiff and had taken possession under his purchase. There was nothing in his cross-bill to indicate whether the contract of purchase was executed or executory, nor whether it was performed in whole or in part by himself. The real nature of the controversy between the parties was disclosed only by the evidence. The defendant as a witness conceded that he had paid no part of the purchase price. He claimed a performance, however, in the sense that he had an account for attorney's fees against the bank to the full amount of such purchase price. He offered no evidence, however, to prove up such account for the purpose of having it offset against the purchase price. Neither did his cross-bill contain any reference to such account.

It should be stated here that on August 2, 1902, the

3. SAME: pleadings: equitable relief.

defendant prepared a statement of account against the plaintiff and receipted the same as follows: "Ida Grove, Ia., Aug. 2, 1902. Ida County Savings Bank, Dr. to Will E. Johnston. To services in case Heinrich v. Ida Co. Sav. Bk., $150.00. To services in case Willits v. Bank, Supreme Court, etc., $300. To services pertaining to liquidation of Ida Co. Sav. Bk. preparing contracts, deeds, advice, etc., $25.00. To services preparing and filing answer, and trial of case of Engle v. Sav. Bk. J. T. Hallam et al., $50.00. Total $525.00. Received payment of the above and foregoing in full this 2d day of August, 1902. (Signed) Will E. Johnston."

*4. ACCOUNT STATED: evidence.*

It is the recollection of the defendant, and he so testified, that he delivered this receipted account to some of the officers of the bank to be applied as a payment upon the purchase price. Of course if this were done and it was assented to by the bank officers, it would amount to an account stated, and no further proof of the items of such account would be necessary.

But the evidence is seriously in dispute at this point. The defendant testified concerning the same as follows: Q. Who did you give the bill to? A. I don't know, Mr. Easton or Mr. Dessel, undoubtedly. It had to be to Mr. Easton or Mr. Dessel; I can not be mistaken. I prepared a bill and a deed which was delivered to the one or the other of those two men or left with the bank for them. On the other hand, Easton and Dessel both testified positively that they never saw the statement prior to the trial. The defendant and the two opposing witnesses testified on the subject with manifest candor. The defendant candidly disclosed that the details of that particular transaction were not clear in his recollection. We would not be justified therefore, in finding this fact established over the positive denial of the other two witnesses concerned. It was therefore incumbent upon the defendant to make legal

proof of his account for attorney's fees in order to render the same available to him as an offset against the purchase price or as the equivalent of performance of the contract on his part.

It is perhaps true that the failure of the plaintiff to ask for alternative relief in the way of a recovery of the purchase price, excused the defendant from setting up a counterclaim for attorney's fees.   On the other hand, the legal title being in the plaintiff, the defendant was bound to justify his possession.   This required a pleading of the contract and a pleading of performance or tender of performance on his part.   And this was especially so when he asked for affirmative equitable relief by his cross-bill. Under the evidence, the plaintiff was not entitled to the relief prayed for in its petition while the defendant stood ready to perform the agreement on his part.   On the other hand, the defendant was not entitled to the relief prayed in his cross-bill except on proof or tender of full performance on his part.   By ignoring the contract, the plaintiff pleaded no breach or rescission thereof.   On the other hand, defendant pleaded no performance or tender of performance on his part.

5. REAL PROP-
   ERTY: con-
   tract of pur-
   chase; plead-
   ings: evidence.

The decree of the trial court granted the defendant full relief on his cross-bill and quieted his title to the land. The result of such decree was to specifically enforce against the plaintiff the executory agreement of sale.   The fact that no performance was shown on defendant's part was wholly ignored in such degree.   If such decree is permitted to stand, it will deprive plaintiff, not only of the land, but of the purchase price as well, because an independent action for the purchase price is apparently barred by the statute of limitations.   On the other hand, if such decree should be reversed or modified to the extent of requiring the defendant to pay the agreed purchase price as a condition to the decree in his favor, then he would be deprived

of the right to offset against the purchase price his present claim for attorney's fees, an independent action for which is also apparently barred by the statute of limitations. We are confronted, therefore, with an unusual dilemna, for which the parties to the case must divide the responsibility, and we pass it for the moment.

II.    It is strongly urged by appellant that the president of the bank had no authority to enter into the agreement contended for by appellee. Reliance is based upon article 6 of the articles of incorporation as follows: "Art. 6. The affairs of the said corporation shall be managed by a board of five directors, and those who shall manage its affairs for the first year are: J. T. Hallam, Thomas P. Hollander, F. L. Hadlock, A. T. Blackman and Julius Sauer." It is also urged that the authority of President Hadlock especially was abridged to some extent on February 5, 1901, by the adoption of the following resolution of the board of directors: "Be it resolved by the board of directors of the Ida County Savings Bank that H. A. Dessel, vice president of said bank employ his entire time in the supervision and conduct of the business of said bank under the direction of the board of directors, as president of the bank at a salary for such services as shall be agreed upon hereafter by the said board of directors and H. A. Dessel." In pursuance of this resolution, Dessel actually became president on June 4, 1901.

<div style="margin-left:2em">6. Banks and Banking: power of officers.</div>

The defendant testified that Dessel himself first suggested the purchase of the land by him. He also testified that his negotiations were had both with Dessel and with Hadlock. Dessel only denies that the agreement was made with him. He fairly concedes that he understood the agreement to be made, but contends that it was so made with Hadlock. It must have been made after February 5, 1901, because Dessel himself leased the land on March 1, 1901. Inasmuch as Dessel knew of the negotiations

with Hadlock and Hadlock's agreement upon the subject and assented thereto by his acquiescence, the legal effect was the same as though both Dessel and Hadlock had partici-pated personally in the agreement.   In the light of the resolution of February 5, 1901, it seems clear to us that the negotiations for the sale were fairly within the pre-sumptive authority of the president of the bank.   The plaintiff had become an involuntary purchaser of the land. As a matter of law, it was forbidden to purchase such land as an original investment.   Code, section 1851.   It was permitted to acquire the same only by way of security for its previous loan.   By the same statute it was required to dispose of the same within ten years.   In the meantime it was carried on the books as an equivalent to the former loan.   There is nothing in article 6 which provides the method by which the affairs of the bank should be managed by the directors.   The method adopted by the board of directors was to appoint a president who should have "the supervision of the conduct and business of said bank under the direction of the board of directors."   If in the making of this agreement the president violated or ignored the direction of the board of directors, such facts was within the special knowledge of the bank officers.

The burden was upon the plaintiff to show that the contract was not authorized or ratified by the directors. *White · v. Creamery Co.*, 108 Iowa, 526; *Patterson v. Robinson*, 116 N. Y. 193 (22 N. E. 372); *Bank v. Bank*, 141 Ind. 352 (40 N. E. 799, 50 Am. St. Rep. 330); *Smith v. Manu-facturing Co.*, 148 Ind. 333 (46 N. E. 1000).

*7. SAME: unauthorized acts: burden of proof.*

The question is one of fact rather than of law.   The question is not whether the articles of incorporation con-ferred power upon the president to make the agreement. It is whether it was within the fair scope of the direction imposed by the board of directors upon the president.   In view of the ordinary character of the transaction, and in.

view of the long-continued and open possession of the defendant and the failure of any officer of the bank to challenge the same for at least a period of five years or more, it leaves little merit to this particular contention.

It was shown that there was no record on the books of the bank showing an authorization by the board of directors. But the controlling question is, Was there

8. SAME: evidence.

authority or ratification in fact? It was not legally necessary that such authority and ratification appear of record. *Stetson v. Northern Inv. Co.*, 104 Iowa, 393; *Bank v. Bank*, 107 Mo. 133 (17 S. W. 644, 28 Am. St. Rep. 405); *Parsons Mfg. Co. v. Hamilton Ice Co.*, 78 N. J. Law, 309 (73 Atl. 254).

III. In view of our conclusion as to the existence of an agreement, it becomes important to determine what was the purchase price agreed upon. Only two witnesses

9. REAL PROPERTY: contract price: evidence.

testified upon this question—Dessel and Johnston. The recollection of neither was very definite. Dessel fixed it at $1,300 or $1,350; Johnston fixed it at $1,200. Turning aside from the testimony of these two witnesses for a moment, it is undisputed that the land was first bargained to Buss for $1,200. This bargain failed because of the character of the title which was not acceptable to Buss. It is undisputed also that the land was charged on the books of the bank to their real estate account at $1,186. These circumstances so strongly corroborate the defendant in this respect that we think the purchase price should be found at $1,200.

IV. Having settled the foregoing finding of facts, we return to our dilemma. In view of the unusual state of the record, we deem it unavoidable to depart some-

10. SAME: appeal: determination of issues: remand.

what from the usual practice in equity cases. It is our conclusion that there should be a decree for the defendant for the enforcement of the contract and quieting his title, and that he should be held to pay therefor the full purchase price, with legal

interest as of March, 1902, subject, however, to the further proviso that he be permitted to offset against such purchase price in whole or in part any valid account held by him against the plaintiff at the time of the institution of this suit.

To this extent the decree of the trial court will be modified, and the case will be remanded to the district court in pursuance of such modification. The district court will give to the defendant an opportunity to plead and prove any valid offset, if any, to the purchase price. Leave will be given to both parties to amend their pleadings to this end, and final decree will be entered in the district court.—*Modified* and *Remanded*.