D. W. BATES, Superintendent of Banking, Plaintiff, v. FIRST SAVINGS BANK of Richland, Defendant.

WASHINGTON STATE BANK of Washington, Appellant, v. D. W. BATES, Superintendent of Banking, Receiver, Appellee.

No. 42874.

JUNE 21, 1935.

T. L. Brookhart and S. W. Livingston, for appellant.

Shaw & Yoder, for appellee.

PARSONS, J.—In this proceeding three banks are involved; the First Savings Bank of Richland, Iowa, hereinafter called "Richland Bank"; the Commercial Savings Bank of Washington, Iowa, hereinafter called "Washington Bank"; and the Washington State Bank, hereinafter called "State Bank".

The first two of these banks are in receivership. The "Washington Bank" was placed in the hands of the receiver on the 5th day of October, 1931, and the "Richland Bank" on the 10th day of October, 1931. The Washington "State Bank" is a corporation formed after the failure of the "Washington Bank", and by arrangements with the receiver on the approval of the court, purchased a large part of the assets of the failed "Washington Bank", and amongst the assets purchased were the assets involved in this proceeding.

This proceeding was instituted by D. W. Bates, superintendent of the banking department of the state of Iowa, who, of course, is the receiver of the "Richland Bank", for the purpose of having the court adjudge the liability or nonliability of the "Richland Bank" to the "State Bank" on account of two notes, known as the Hinshaw note for $5,000 and the Jones note for $4,000, which had been taken over from the "Richland Bank" by the "Washington Bank". These two notes were originally owned by the "Richland Bank" and were subsequently held by the "Washington Bank", and were turned over to the "State Bank" in the purchase of the assets from the then receiver Andrew. .

The "Richland Bank" had an account with the "Washington Bank", and on the 2d day of March, 1931, this account was overdrawn in the amount of $6,488.86, and on that date the "Richland Bank" sent to the "Washington Bank" the Hinshaw and Jones notes

indorsed by the cashier "without recourse". The "Washington Bank" refused to take the notes with such an indorsement, and demanded of the "Richland Bank" an agreement providing, in brief, that the "Washington Bank" should receive all interest collected on the notes and retain the interest from and after that date, and that the "Richland Bank" should have the right at any time to repurchase the notes or either of them from the "Washington Bank" for the face amount of said notes, plus interest thereon at 6 per cent from and after date, and to purchase said notes on the 1st day of July, 1931, on the basis mentioned. This agreement was signed by the cashier of the "Richland Bank" and forwarded to the "Washington Bank", accompanied by a letter as follows: "Will get the resolution of our board authorizing us to rediscount with your bank right away and mail the same to you," to which a reply was made, "We trust the resolution of your board authorizing you to rediscount will be received soon in order to complete the entire transaction." Finally, on the 23d day of March, 1931, there was a meeting of the board of directors of the "Richland Bank", and the minutes show a resolution authorizing the cashier or vice president to borrow, sell, or rediscount with the Commercial Savings Bank at Washington, Iowa, was passed, saying "a copy of which is on file in the bank". A copy of this resolution was sent to the "Washington Bank".

The records of the "Richland Bank" show that the Hinshaw note and the Jones note had been rediscounted with the "Washington Bank" and on the records of that bank appeared the note that according to the records of the "Washington Bank" the two notes had not been rediscounted, but were sold without recourse. That these notes were indorsed "without recourse" but they held a repurchase agreement dated 3-3-31 whereby the "Richland Bank" agreed to repurchase these notes on or before 7-1-31. This was in the inventory filed by the receiver of the "Richland Bank", and approved by the Keokuk county district court where the receivership was pending. On the 25th day of September, 1931, the "Washington Bank" extended a line of credit consisting of rediscounts to the amount of $8,000 to the "Richland Bank", forwarding to the "Richland Bank" a form of agreement for that bank to enter into. This agreement is set out in the record and it recited that the "Richland Bank" had deposited with the "Washington Bank" as "collateral security for payment of each and every liability or liabilities, either direct or contingent, now owing, or which may hereafter be owing,

whether now or hereafter contracted, either on account or by note or notes or rediscounts or in any other manner created," and provided further for the sale of the securities deposited with the "Washington Bank"; in brief, it inured to that bank, its successors or assigns, giving them the same power. It appears further a large amount of security was put up by the "Richland Bank" with the "Washington Bank" to secure the latter bank in its dealings with the "Richland Bank". These securities aggregated $24,696.28, and a credit was given the "Richland Bank" for $8,000 at the time of receiving the securities. It further appears that when the Hinshaw and Jones notes were sent to the "Washington Bank", the "Richland Bank" marked them "paid"; that is, charged them off of the account of the bank. They were finally, however, recharged back into that bank and carried in such a way as to show that the bank had some liability upon them yet.

In brief, the claims of the "State Bank" are that by reason of these various transactions of the borrowing of money, that is the giving of credit on the books of the "Washington Bank" to the "Richland Bank", all by the action of the bank, created a liability; that this liability continued in existence; and that finally with due authority the "Richland Bank" put up as collateral security to all of the claims, direct, contingent, or otherwise, of the "Washington Bank" against itself, and in that security was the collateral involved in this action.

·The application of the receiver in this matter simply asked the court to determine the legal effect of these matters, and asked the court to find that if there is no liability upon the Hinshaw and Jones notes of the "Richland Bank" that all of the collateral held by the "Washington Bank" be turned over to him; that in the event the "Richland Bank" is liable, that he is desirous of liquidating such liability as might exist, and required that the "State Bank", the successors of the rights of the "Washington Bank", turn over to the receiver of the "Richland Bank" any rediscounts remaining after the application of cash collateral now held by the "State Bank".

In other words, he wants an accounting between the two defunct banks that existed before, and wants to set off the one liability against the other, and if there is no liability on the part of the "Richland Bank", that the collateral be turned over; if there is a liability, that he be permitted to adjust it.

It appears further in the allegations of the application that it is brought in deference to the wishes of the depositors who desire to contest in some way or another as to the liability between the two defunct banks, and to carry their contest so far that if the receiver settles without an order of court, such as he asks, that they will file objections to the receiver's report.

The "Washington State Bank" files an answer in this case admitting most of the allegations of the receiver made in his application, setting up the facts as viewed by that bank, and, of course, pleads its successorship to the rights of the "Washington Bank" in the matter. It pleads that it is not informed as to what the loss on the Hinshaw and Jones notes will be, but alleges that whatever the same may be it is entitled to reimburse itself out of the collateral deposited to the "Washington Bank" and transferred and assigned to the "State Bank", and sets forth specifically a liability on the repurchase agreement. The "State Bank" sets forth further that by reason of reliance upon the transfer of the Hinshaw and Jones notes to the "Washington Bank", and the performance of the repurchase agreements, the "Washington Bank" extended credit to the "Richland Bank", and that its representatives are now estopped from denying the repurchase, the validity of the claim, and the transfer of the collateral. It also sets up that the "Richland Bank" having received benefits of the transaction, and credits set out in the application from the "Washington Bank", cannot with equity procure annulment and cancellation of any of said agreements and contracts, pursuant to which the "Washington Bank" parted with valuable consideration, the benefit of which was received by the "Richland Bank", without restoring to the "Washington Bank", its successors and assigns, all benefits received therefrom.

Such are the issues made by the parties, and such are the material facts upon which they were based. This matter was submitted to the court, and on the 15th day of September, 1934, the court entered its judgment. It held that the collateral was pledged to the "Washington Bank" and an agreement was entered into on that date with reference to said collateral security; it found that the receiver of the "Richland Bank" sold certain assets of that bank, amongst them the Jones and Hinshaw notes, and that all of the paper taken over by the "Washington Bank" had been liquidated except the Hinshaw and Jones notes; and finds that there was never any demand made by the "Washington Bank" on the "Richland Bank"

to repurchase the Hinshaw and Jones notes, and that these were sold to the "State Bank" as the notes of the "Washington Bank", and generally finds that all the collateral notes amounting to the sum of $23,000 are the property of the "Richland Bank", and should be turned over to the receiver of said bank, all of which was excepted to by the "Washington State Bank".

It is urged by the appellee that under section 9222-c2 of the Code the officers could not pledge or hypothecate the assets of the bank without being authorized by the board of directors so to do. This section provides that the cashier or any other officer or employee of the bank shall have no power to pledge or hypothecate any bonds, notes, or other obligations owned by said bank or trust company until such power and authority shall have been given, at least annually, pursuant to a resolution by the board of directors, a written record of which proceedings shall first have been made; and that a certified copy of said resolution signed by the president and cashier with the corporate seal annexed shall be conclusive evidence of the grant of such power. The section then makes it an offense for such pledge or hypothecation to be made.

It is alleged in the application of the receiver that on the 25th day of September, 1931, a line of credits consisting of rediscounts in the amount of $8,000 was extended, and that it was part of the transactions that the managing officers of the "Richland Bank" forwarded to the "Washington Bank". The agreement set out that all of the collateral held by the "Washington Bank" was to be held as collateral security for the payment of each and every liability or liabilities, either direct or contingent as between the two banks, which has been heretofore referred to. This court had a matter of this sort before it in In re Claim of J. B. Hannahs, 217 Iowa 1016, 252 N. W. 539, and in discussing section 9222-c2 the court cited section 9297 of the Code, and stated that the argument for the appellant rather subordinates section 9297 to section 9222-c2, and holds that if there was any inconsistency between them the legislative history would favor 9297, which section is the product of the 43d General Assembly, chapter 30, section 20, and 44th General Assembly, chapter 205; whereas section 9222-c2 was the product of the 43d General Assembly, chapter 30, section 21, saying: "The last legislative touch rested therefore upon section 9297", and goes on to say that it will be noted that 9222-c2 purports to restrict the power of a subordinate officer to pledge or hypothecate the assets

1364

of the corporation without authority from the directorate; and turning to 9297, express authority is conferred upon the directors of such corporation to pledge and to hypothecate, and this power is conferred in broad general terms and without restrictions. And further points out that in the case of Andrew v. Iowa State Bank of Osceola, 216 Iowa 1170, 250 N. W. 492, that the failure of the board of directors to record its proceedings would not render such proceedings nugatory; and that such proceedings were provable in favor of third parties by evidence of the facts nevertheless.

So, if, on September 25, 1931, there were any debts or obligations of any kind coming to the "Washington Bank" from the "Richland Bank", it seems to us that the pledge of the assets to secure such obligations is legal and binding upon the "Richland Bank".

Going now to the discussion of the liability as between the banks, it is evident from the record in this case that the "Washington Bank" would not take the Hinshaw and Jones notes upon a mere indorsement "without recourse", and made requirements of a repurchase agreement before it would give credit to the "Richland Bank", and amongst the requirements before it would take the notes was that it have the agreement of March 3, 1931, from the "Richland Bank"; that the agreement provided, first, that the "Washington Bank" should receive all interest collected on said notes and retain the interest from and after date, the notes having been negotiated shortly after date; second, that the "Richland Bank" should have the right at any time to repurchase for the face amount, plus interest at 6 per cent per annum from and after the date of the agreement; and, third, that the "Richland Bank" promise to purchase said notes on the 1st day of July, 1931, on the basis above mentioned. In other words, that the "Richland Bank" could at any time take back the notes under their agreement, or if it did not exercise that option before, it was under obligations to purchase on July 1, 1931. This is borne out by the records of the "Washington Bank", and by the facts as shown, that the "Washington Bank" did not take these notes until this was done, and although they had been charged off by the "Richland Bank" from the time sent, they were charged back afterwards. The record also shows that credits were granted to the "Richland Bank" from time to time afterwards, upon the faith of these agreements and upon the faith of the representations made by the "Richland Bank", and by reason of the receipt by the "Washington Bank" of this agreement of repurchase

signed by the officers of the bank. So. whether or not the officers of the "Richland Bank", as such, had any authority specifically given by the board of directors or any one else to enter into such a repurchase agreement, yet they did enter into it under the representation it was authorized by the bank and board of directors, received the credits, used it up, and used a lot since, on the faith of it, hence the "Richland Bank" cannot repudiate this without returning the amount received.

■ There was an express obligation on the part of the "Richland Bank" to repurchase these two notes on the first day of July, 1931. The demand to make such purchase on that particular date, or on any date thereafter was not necessary. It was under obligation so to do. It would be unconscionable for the "Richland Bank" to be allowed to keep the proceeds of what it obtained by reason of these actions of its officers. Such is the law as laid down in 21 Corpus Juris 1206, section 207, as follows:

"Where one having the right to accept or reject a transaction takes or retains the benefits thereunder, he ratifies the transaction, is bound by it. and cannot avoid its obligations or effect by taking a position inconsistent therewith, and the estoppel thus created is operative against his personal representative."

German Savings Bank v. Des Moines National Bank, 122 Iowa 737, 98 N. W. 606, is a case in which the cashier of the German Savings Bank borrowed money out of the bank both individually and for the Capital City Oatmeal Company, of which he was treasurer. The notes were discounted to the Des Moines National Bank. The opinion says, on page 738:

"The transactions by which these loans were originally made are not disclosed by the record. For the purposes of this case, their validity is not questioned, for the reason that the bank received and retained their full value when discounted to the Des Moines National Bank."

There was a statute which provided that a loan by a bank to its cashier, not specifically passed upon by the board of directors, was illegal, although a general resolution of the board authorizing loans to its officials had been adopted. The notes discounted had been renewed several times. The German Savings Bank insisted that it was under no obligations to take up the notes of its cashier,

individually and as treasurer, and that payment was procured by falsely representing they were obtained by discount and indorsement in the ordinary course of business, and further said, on page 740:

"It is enough now to say that any loan to an officer of the bank not passed upon by the board of directors was illegal, and a blanket resolution like that adopted will afford no protection."

It points out that the original notes signed by the cashier were indorsed by him, or accompanied by written letters of guaranty so signed when transferred to the National Bank, and the latter parted with money equaling their face value on the faith of this indorsement or guaranty. The Savings Bank retained the money so received and thereby acquiesced in what was done in procuring it, effectually ratifying the acts of its cashier, so that the National Bank was undoubtedly charged with notice that the cashier had no authority to deal with himself individually or as treasurer of the oatmeal company to extend the time of the notes outstanding. The National Bank demanded immediate payment of these notes discounted to it, and was given a check on the Savings Bank, which was credited against its deposit in the National Bank. The Savings Bank insisted it was under no obligations to take up the notes of the cashier individually and as treasurer of the oatmeal company, that the payment was received by false representations. The opinion pointed out that the circumstance that they were paid before maturity was enough to arouse inquiry, and, if followed up, would doubtless have led to the discovery of the general written guaranty, if there was any. Moreover, the books and officers of both banks were accessible, and no obstacle was interposed to any investigation the officers of the Savings Bank might have desired to make. That they should have remained in utter ignorance of the character and genesis of these notes for four years is inexplainable unless attributed to the perverse inattention to their own interests. That by the exercise of ordinary diligence they ought to have ascertained the facts within a few days, or at the utmost within a few weeks after the transaction, and the Savings Bank was denied recovery. See, also, State ex rel. Carroll v. Corning Sav. Bank, 139 Iowa 338, 115 N. W. 937; Ida County Sav. Bank v. Johnson, 156 Iowa 234, 237, 136 N. W. 225.

Under section 9156, savings banks were given the power to transact the usual business of such institutions, and under section 9297, enacted after 9222-c2, the power to do this business existed, so if there was any obligation whatever of the "Richland Bank" to the "Washington Bank", necessarily under the agreement of September 25, 1931, pledging all of the collateral as security, the officers of the bank without any action of the board of directors had power to so do.

So we hold that these transactions amounted to a pledge of the collateral in question in this suit to the "Washington Bank" securing any and all obligations on the part of the "Richland Bank" to purchase the two notes in question, and that obligation would be enforceable.

Beside the foregoing considerations, the minute book of the "Richland Bank" shows that on March 23, 1931, a resolution by the board of said bank was passed, authorizing the cashier or vice president to borrow, sell, or rediscount with the Commercial Savings Bank of Washington, Iowa, and the record in the case shows further that it forwarded to the "Washington Bank" the agreement by which it pledged the collateral turned over to the "Washington Bank", for any and all obligations of the "Richland Bank" to the "Washington Bank". So that there was not only, as before recited herein, the receipt by the "Richland Bank" of the credits, but there was the specific pledging of the collateral turned over the 25th of September, 1931, as security for all the obligations to the "Washington Bank".

As to whether or not the "Washington Bank" could enforce this, is the only other remaining question in the case. There is no question in the record but what the Washington State Bank was the owner of all the assets that were turned over to the bank by the receiver, and that among these assets were the Hinshaw and Jones notes, and that the collateral held by the "Washington Bank" was pledged for those liabilities. There is no question but what, where a transfer is made (accounts, notes, mortgages, etc.), it carries with it all the security pledged for the payment. No one would think but what the assignment of a note secured by a mortgage carries with it the mortgage. Therefore, on the whole case we conclude that the trial court gave the wrong decision; that the trial court should have held that the Washington State Bank was entitled to retain the collateral held by it until the Hinshaw and Jones notes

were taken up, and that therefore the order should have been by the court that the receiver was directed to recognize the rights of the Washington State Bank, and to either take up its claim or negotiate for the settlement thereof; and that in the event he did not do so, the Washington State Bank would be entitled to hold the collateral involved for its security until it was fully satisfied, and that there should have been an adjustment between the receiver in this case and the Washington State Bank, that bank accounting for all it received, giving a full account of the collateral it still held, for claims against the "Richland Bank", as well as turn over the collateral upon the satisfaction of what claims the Washington State Bank had against the "Richland Bank". So the decision of the district court is reversed and remanded with instructions to enter a decree in accordance with the directions herein given—Reversed and remanded.

ANDERSON, C. J., and ALBERT, DONEGAN, POWERS, and RICHARDS, JJ., concur.